UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE:  ROCK 'N PLAY SLEEPER | ) | MDL No. 1:19-md-2903 |
| MARKETING, SALES PRACTICES, AND | ) | |
| PRODUCTS LIABILITY LITIGATION | ) | This Document Relates to:  ALL CASES |

## CLASS CERTIFICATION ORDER

Plaintiffs in this multi-district litigation case are parents and other persons who purchased or owned the Fisher-Price Rock 'N Play Sleeper (the "Sleeper") prior to a national recall directed by the Consumer Product Safety Commission in 2019.  Plaintiffs claim that defendant Fisher-Price, Inc., falsely advertised the Sleeper as safe for infant sleep.  Plaintiffs have filed multiple class action lawsuits in federal court in 17 states.  These claims are restated in a single Consolidated Amended Complaint ("CAC") filed in this MDL proceeding.  (Doc. 19.)

For people who bought a new Sleeper, the lawsuits seek money damages in the form of a refund of the purchase price, either full or partial.  The claims are consumer claims only.  Claims for wrongful death or injury are excluded from the CAC.  Plaintiffs seek relief through state consumer protection laws as well as negligence, warranty, and unjust enrichment claims.  The lawsuits also seek injunctive relief through a second recall procedure for anyone who owns a Sleeper today.   These would include gift recipients and second-hand purchasers who did not purchase a new Sleeper themselves.  Alternatively, plaintiffs seek certification of a limited "issues class" pursuant to Fed. R. Civ. P. 23(c)(4) for liability issues only.

The United States Judicial Panel on Multidistrict Litigation designated the case as an MDL proceeding by order dated August 1, 2019, and assigned the case to the Western District of New York.  Fisher-Price has its headquarters in East Aurora, New York, close to Buffalo.

The parties have conducted discovery on a bifurcated basis, focusing first on issues related to class certification. In a previous order, the court identified the proposed class of New York purchasers as the class action for which it will first consider certification. (Doc. 219.) Consequently, this decision is limited to issues of certification for the New York class only. Plaintiffs describe the New York class as "[a]ll persons who purchased or owned any model of Fisher-Price Rock 'n Play Sleeper in New York from 2009 to the present." CAC ¶ 244.

## FACTS

The facts relevant to class certification are generally not in dispute. These include facts concerning the development, marketing and recall of the Sleeper. The parties disagree about the conclusions to be drawn from these facts, specifically whether Fisher-Price made deceptive claims through its marketing program about the safety of the Sleeper for infant sleep and whether consumers who purchased the product suffered damages that exceed the remedy already afforded by the recall.

Fisher-Price introduced the Sleeper in 2009. In describing the product's origin, Fisher-Price states that one of its employees had an infant who had trouble sleeping due to colic. Her baby slept better when she raised the baby's head. She took this observation to product designers at Fisher-Price who developed the inclined Sleeper.

The Sleeper does not follow the recommendation of many pediatricians that infants should sleep on their backs on a flat surface free of bedding. The American Academy of Pediatrics ("AAP") has long supported these "Back to Sleep" recommendations in order to reduce infant mortality. *American Academy of Pediatrics Task Force on Infant Positioning and SIDS, Pediatrics*, Vol. 89(6): 1120-1126 (1992), available through pubmed.ncbi.nlm.nih.gov/1603575/. In 2016, the AAP issued recommendations against placing

2

babies in sitting devices for routine sleep.  RY Moon, Task Force on Sudden Infant Death

Syndrome.  SIDS and other sleep-related infant deaths: evidence base for 2016 updated

recommendations for a safe infant sleeping environment.  *Pediatrics 2016*; 138(5): e20162940.

Although Fisher-Price produced and sold many versions of the Sleeper, all share a common

design.  A padded plastic tub, reclining at an angle of 30 degrees, rests between supports on

either side.  The baby lies on her back in the tub with her head elevated.  The Sleeper jiggles and

rocks in a soothing fashion.  Many versions feature mobiles and other toys hanging overhead.

Some include music.  The product was marketed as a place for babies to sleep or to recline while

awake.  Advertising for the product promoted both uses.  Prices varied between less than $50 and

as much as $150.  Most units sold for about $70.

Fisher-Price was not the only manufacturer of reclining infant seats.  At least seven other

manufacturers have participated in CPSC recalls of similar sleeper products,

CPSC.gov/SafeSleep (last visited on May 5, 2022), and in 2019 the CPSC issued a general

warning against infant sleep products with inclined seat backs of more than 10 degrees.

CPSC.gov/Newsroom/News-Releases/2020/CPSC-Cautions-Consumer-Not-to-Use-Inclined-

Infant-Sleep-Products (last visited on May 5, 2022).

Fisher-Price sold the Sleeper until April 2019 when reports of death or injury began to

mount.  Between 2009 and 2019, Fisher-Price sold 4.7 million units in the United States.   On

April 5, 2019, Fisher-Price and the Consumer Product Safety Commission issued an alert

warning parents and caregivers to discontinue use of the Sleeper when a baby was old enough to

roll over.  Plaintiffs Ex. 20.  The warning followed reports of infant deaths through suffocation.

The alert stated that "[t]o ensure a safe sleep environment for infants, we remind parents and

caregivers to follow all safety warnings included with the product:  always use the provided

3

restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the Rock 'n Play Sleeper." (Doc. 125-23.)

On April 8, 2019, *Consumer Reports* published a lengthy expose of child deaths that the publication attributed to the design of the Sleeper. The article referenced 32 infant deaths as well as non-fatal positional injuries. On April 12, 2019, the CPSC and Fisher-Price announced a national recall of all models of the Rock 'n Play Sleeper. (Doc. 125-20.)

The recall terms provided for a refund of the purchase price to customers who purchased the Sleeper after October 12, 2018. Owners of Sleepers purchased new before that date were entitled to choose a product from a catalog selection of Fisher-Price products. Customers were required to demonstrate that they had destroyed their Sleeper by sending in certain components (the "hubs" which connected the tub to the frame) with their proof of purchase.

Plaintiffs complain that the voluntary recall was an inadequate remedy. Consumers returned approximately 250,000 units out of 4.7 million sold. Hearing Transcript ("Tr.") 23.[1] In plaintiffs' view, for many consumers, the exchange of a Sleeper for a catalog credit valued at $30 fell short of full compensation. They seek a more robust recall effort with fewer restrictions and requirements and a cash refund of the purchase price.

Fisher-Price and its parent company Mattel defend the Sleeper as a safe product. They describe the CPSC recall as a sufficient remedy and resist any effort to create a second recall through the court process. They direct attention to the benefits of the Sleeper for the millions of families who did not experience an injury or tragedy. In Fisher-Price's view, the withdrawal of the Sleeper from the market was a business decision driven by adverse publicity. It was not an admission of fault or defect in the product or deception in its advertising.

---

[1] Transcript references are to the class certification motion hearing held on February 25, 2022. *See* Doc. 251.

## I. Fed. R. Civ. P. 23(a) Criteria

The court will examine each of the criteria for class certification under Fed. R. Civ. P. 23(a)(1) – (4). Plaintiffs have the burden of establishing that the proposed class action meets each of the four criteria.

### A. Numerosity

The parties agree that this criterion is present. Although exact sales figures are not available, the plaintiffs have received information that Fisher-Price sold more than 100,000 units of the Sleeper in New York State prior to April 2019. Tr. 7. This figure greatly exceeds the presumptive standard of 40 class members frequently applied within the Second Circuit. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995). Joinder of so many potential cases would be impracticable, as would individual adjudications. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir. 1992).

### B. Commonality

At the class certification hearing, plaintiffs identified numerous potential common issues. These include:

- Whether defendants misrepresented the Sleeper as safe for infant sleep;
- Whether the name of the "Rock 'n Play Sleeper" and the defendants' marketing information were likely to mislead consumers;
- Whether defendants omitted information about the risks and alleged lack of appropriate testing of the Sleeper;
- Whether these omissions were likely to mislead the reasonable consumer; and
- Whether defendants violated New York's consumer protection law, NY GBL § 349.

Defendants deferred their response on this issue to the related criterion of predominance set forth at Fed. R. Civ. P. 23(b)(3).

The court finds that plaintiffs have met their burden of proof that there are common questions of law or fact. The Sleeper products are all very similar. The risk of death or injury alleged by plaintiffs does not vary from one model of the Sleeper to the next. The marketing information for all Sleepers is similar and frequently features bedtime scenes and sleeping infants. The New York consumer protection claim requires proof that a reasonable consumer would find the alleged false statements to be material to the decision to purchase the product. All of these questions include common elements sufficient to satisfy the commonality requirement.

The court reaches this conclusion without making any ruling on the related requirement of predominance. In particular, this conclusion does not take into account the difficulty of proving causation of injury by evidence common to all class members.

## C. Typicality

The typicality issue in this case arises from the fact that the single proposed class representative – Ms. Alfaro –participated in the voluntary recall and received a voucher from Fisher-Price after she returned proof of purchase of her Sleeper. She exchanged the voucher for a Fisher-Price dinosaur toy with a stated value of $29.99.

Defendants argue that Ms. Alfaro lacks standing to pursue a further claim against Fisher-Price because she has been fully compensated. Tr. 18, 25. In their view, it is not necessary to determine the value of what she received and any resulting set-off. Rather, it is the presence of a potential standing defense that distinguishes Ms. Alfaro from other class members who received nothing through the recall process.

Plaintiffs respond that the recall provided Ms. Alfaro with only a partial refund. Like other potential class members who took part in the recall, her claim may be subject to an offset for the value she has already received, but she has the same interest as other class members in pursuing a full cash refund. Tr. 17.

Defendants describe the defense against Ms. Alfaro's claim as one of constitutional standing. Because she has received a toy dinosaur valued in the recall process at $30, defendants argue that she lacks standing to make any further claim. In response, she claims that her damages exceed the value of the toy for several reasons: the toy is not worth $30; she is entitled to a full refund; and even if her damages are computed on a class-wide basis through conjoint analysis, they exceed $30.

There is no basis to apply the constitutional standing doctrine to bar plaintiff's claim.[2] In directing attention to Ms. Alfaro's participation in the recall, defendants have asserted a traditional affirmative defense of accord and satisfaction. "Accord and satisfaction is the payment of money (or some other thing of value), usually less than the amount owed or demanded, in exchange for the extinguishment of the debt." *New Dance Grp. Studio, Inc. v. St. Paul Fire & Marine Ins. Co.*, 1995 WL 434314, at *3 (S.D.N.Y. July 24, 1995). They believe they have already paid Ms. Alfaro the value of her claim. She denies that she has accepted full

---

[2] Standing requires proof of the invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). In this case, the claimed loss is economic. Plaintiff Alfaro alleges that defendants misrepresented the safety and value of the product. Whether she loses at trial because she has already received more than the value of her claim is not a standing issue. Clearly she has standing as a purchaser or consumer of the product to make a claim under § 349. Rather, the value of her claim – including the possibility that it is zero – is a merits issue, not a constitutional requirement to be determined before trial. Every year some plaintiffs go to trial and recover nothing because of prior payments by the defendant or third-parties. We do not say, "the plaintiff lacked constitutional standing." Rather, the court enters judgment on the merits in favor of the defendant because of the offset.

payment of her claim. Defendants have the burden of proof on the defense. Proof will require some determination of the value of the toy and its offset against whatever amount may be due Ms. Alfaro at trial.

Participation in a refund program does not generally disqualify a class representative on typicality grounds. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015); *Rodriguez v. It's Just Lunch, Int'l,* 300 F.R.D. 125, 147 (S.D.N.Y. 2014) ("The fact that some prospective … class members may have received credits or refunds does not preclude certification pursuant to Rule 23(b)(3)."). The court has no basis for ruling now whether the dinosaur toy exceeds Ms. Alfaro's potential § 349 recovery (and her related claims under New York law). That is a merits issue. But the mere presence of an offset does not defeat her claim of typicality. "[T]he existence of defenses unique to the named plaintiff may preclude class certification only if the unique defenses "threaten to become the focus of the litigation." *Butto v. Collecto Inc.*, 290 F.R.D. 372, 384 (E.D.N.Y. 2013) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (1990), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017)).

The merits of this litigation will not turn on whether a class representative took part in the recall. The names of all recall claimants are known; determining the value of any offset is a matter of common proof. There is no likelihood that these issues will threaten to become the focus of the litigation. The primary merits issues concern the risks of the Sleeper; their disclosure to consumers; and the injury suffered by consumers. On these issues, Ms. Alfaro's interests and concerns are typical of all other class members, including those who participated in the recall and the greater number who did not.

The court is satisfied that the plaintiffs have met their burden of demonstrating typicality.

### D. Fair and Adequate Protection of the Class

Defendants criticize Ms. Alfaro's ability to fairly and adequately protect the class because of her participation in the recall. In their view, her testimony that she was easily able to return the hubs and documentation and obtain a voucher conflicts with the plaintiffs' claim that the recall was poorly conceived and too difficult for participants. They also contend that her receipt of the dinosaur toy will reduce her commitment to the cause of consumers who have received nothing.

Plaintiffs respond that Ms. Alfaro is strongly committed to infant safety and has already demonstrated her commitment by participating in individual discovery.

The court recognizes the theoretical conflict between a class representative who has received something of value and those who received nothing because they did not participate in the CPSC recall. The conflict is offset by Ms. Alfaro's clear commitment to the class action process. The court accepts plaintiffs' counsel's representation that Ms. Alfaro is neither an attorney's friend or relative nor frequently a plaintiff in class actions. Rather, she researched the safety issues presented by the Sleeper herself and sought out an attorney to help her seek relief for the benefit of all parents. In a case with a maximum individual value of $50 - $75, representing the range of purchase prices in most cases, the prior receipt of $30 is unlikely to alter Ms. Alfaro's commitment to the cause she has identified. The clearest demonstration of her ability and willingness to protect class interests was her willingness to sit for a lengthy deposition concerning private family matters such as sleep habits and childcare.

The court is satisfied that Ms. Alfaro is an appropriate representative of the class and that her history of taking part in the recall does not cast significant doubt on her ability to serve as a class representative.

Defendants do not challenge Ms. Mulvey – the class representative for the injunctive class only due to her status as a gift recipient of the Sleeper – on grounds of fair and adequate representation.

### E. Ascertainability

In addition to the four express requirements of Fed. R. Civ. P. 23(a), courts within the Second Circuit recognize an implied requirement of "ascertainability." "An identifiable class exists if its members can be ascertained by reference to objective criteria." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) (quoting *Zapka v. Coca-Cola Co.*, 2000 WL 1644539 (N.D. Ill. Oct. 27, 2000). In this case, purchase or ownership of the Sleeper are objective criteria that satisfy the requirements of ascertainability.

The court is satisfied that plaintiff has established that the proposed New York class satisfies the requirements of Fed. R. Civ. P. 23(a).

### II. Rule 23(b)(3) Criteria

Rule 23(b)(3) establishes additional criteria applicable to class actions for money damages. Plaintiff seeks monetary compensation in the form of the return of some or all of the purchase price for Sleepers sold in New York State. The primary basis for this claim is the alleged violation of NY GBL § 349. Plaintiffs also make claims for breach of implied warranties of merchantability and fitness for a particular purpose pursuant to N.Y. U.C.C. § § 2-314 and 2-315; and unjust enrichment.[3]

Before applying the Rule 23(b)(3) criteria to the elements of the New York claims, the court makes limited findings for purposes of the certification ruling. It is a common observation

---

[3] Although the CAC asserts a negligence claim under New York law, plaintiffs in their briefing do not pursue this claim except in the states of New Jersey and Arkansas. (Doc. 125 at 38; Doc. 165 at 48.) The court will not address certification of a New York negligence claim.

in class action decisions that the certification decision requires the court to engage with the facts in the course of reaching a decision on the various criteria contained in Rule 23. This case is no exception. These findings are intended to explain the court's rulings on specific elements of the certification decision. They are drawn from the substantial body of documentation provided by the parties, official communications from the CPSC posted on its website, and the common experience of any parent of an infant.

### A. The Marketing Campaign

The Sleeper was designed for infants up to the age of three to five months. In years prior to the recall, Fisher-Price affixed a warning label to the Sleeper identifying a "fall hazard" for infants old enough to roll over or pull themselves up. The label identified this age as five months. CAC, ¶ 207 (Doc 19). In a similar vein, on April 5, 2019, shortly before the recall, Fisher-Price and the CPSC issued a safety alert recommending that "consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities." (Doc. 125-23.)

The marketing budget for the Sleeper was modest – a total of three million dollars spent over ten years generating sales of 4.7 million units. Fisher-Price marketed the Sleeper in part through "mommy bloggers" who received free products and other payment in exchange for online reviews. Word of mouth among parents was significant. There were also print and online advertisements showing parents and babies using the product.

A principal theme of the marketing campaign was that the Sleeper helped babies to sleep. Packaging for the Sleeper and other marketing materials depicted babies sleeping. Fisher-Price also marketed the Sleeper as a place for a baby to sit and play while awake. Parents could "park" a baby in the Sleeper while they attended to other chores. Features directed at an infant's time

11

awake included mobiles, toys, and other displays designed to distract and entertain a baby. But if there is one overriding theme in the materials provided to the court by both sides, it is infant sleep. Some of the most compelling photos – frequently reproduced – show nighttime scenes of sleeping babies and parents resting nearby. CAC, ¶ 185 (Fig. 6-8).

All parents – indeed anyone who spends time with a young infant – appreciates the role of sleep in a baby's life. Day and night, new babies drop off to sleep on short notice. Experience varies, but healthy infants spend more time sleeping than awake. It only seems that they are awake all the time because of the demands placed on their parents. The boundary between waking and sleep for infants is fluid. Babies less than three months old never seem to sleep long enough, but they do not stay awake for long either. These are not scientific observations. They represent the universal experience of parenthood, known even to judges and attorneys.

Any examination of the Fisher-Price marketing materials must recognize the central theme of sleep as a reason to buy and use the "Rock'n Play Sleeper." That is why it is called a Sleeper. The name – and the marketing materials – also signal that it is a place for infant play. "Play" as an infant reclines in the Sleeper consists mainly of looking at things and reaching for things. Jiggling and a little light bouncing are also soothing and entertaining. Certainly these activities formed part of the marketing campaign. That is why "rocking" and "playing" are included in the product name and the advertising. But these activities are part of a cycle of infant life marked by frequent naps, and the use of the product for infant sleep is emphasized in the marketing materials.

The court is not persuaded by the defense arguments that the Sleeper was marketed to some parents for sleep and to others as a place for babies to play. Or that different parents chose

the Sleeper for different reasons – some for sleep and others for play. That is simply not how the life of an infant works. In their first months of life, infants sleep, play, eat, and cry, all within a single short interval, before repeating the pattern. The promotion of the Sleeper for infant sleep is inextricably woven through the Fisher-Price advertising campaign. Fisher-Price described the Sleeper as a place for both sleep and play, and parents responded to the campaign. There is good reason to find for purposes of class certification that class members were exposed to the same marketing claims, strongly suggested by photos of sleeping babies as well as the very name of the product, that the Sleeper was a safe place for infant sleep.

### B. Consumer Experience

The court makes a second finding that is more favorable to the defendants. Most families used the Sleeper without injury or tragic death of their infant. The product was successful in the sense that babies seem to have been very comfortable in the Sleeper. Millions slept and played in the product without incident. Plaintiff's representative Ms. Alfaro provides a good example. In her deposition, she describes how helpful the Sleeper was as she cared for her children. In making these observations, the court joins both sides in recognizing the tragedy experienced by families whose children died while using the Sleeper. The loss to parents whose children suffered injuries is also very serious. The claims of these parents are excluded from any putative class in this litigation.

The satisfaction of many families with their use of the Sleeper has a second aspect. Unlike a swing set or a crib that converts into a child's bed, the Sleeper was only useful for the first three to five months of a child's life. Babies quickly outgrew it. Like a cradle or bassinette, the Sleeper might be used by younger siblings or given to a friend or sold at a yard sale, but no child used it for long. Since the Sleeper was sold for ten years, a large number of consumers had

stopped using it by the time of the CPSC recall – at least for the child for whom it was originally purchased. Other families were actually using the Sleeper when the recall intervened and they learned of the danger to their child. Over ten years, family experiences varied widely.

### C. Predominance of Questions of Law or Fact

Fed. R. Civ. P. 23(b)(3) requires plaintiffs who seek money damages to prove two elements in addition to the requirements of Fed. R. Civ. P. 23(a). These are that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The predominance element frequently provides the critical test for class certification. That is certainly the case here. The predominance issue is at the heart of the court's certification decision.

"The predominance requirement of Rule 23(b)(3) tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (cleaned up). This inquiry focuses attention on whether the proof at trial is likely to depend on evidence common to all class members. "The predominance requirement is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 538 (2d Cir. 2016).

Plaintiffs contend that common questions of fact predominate because a single defendant-manufacturer (Fisher-Price) sold a single product (the Sleeper) through a marketing campaign that emphasized sleep as one of the uses of the Sleeper. In plaintiff's view, the consensus of the

pediatric community and the decision of the CPSC provide evidence that the Sleeper is not a safe place for a parent to place their infant to sleep. They seek either a full refund of the purchase price or a percentage based on the lower price an average consumer would pay with full information about the product's risk to a sleeping baby. Plaintiffs view all of these issues as appropriate for a single class-wide determination on the basis of evidence about the design, marketing, and risks of the product.

Defendants respond that the Sleeper came in many versions -- many featuring toys and devices to entertain a baby while she is awake. Their research shows that parents bought the product for different reasons and at multiple price points. While they recognize that sleep was a major theme of their marketing program, they identify word-of-mouth as the most important basis for sales of the Sleeper. In defendants' view, the experience of each parent who owned a Sleeper is unique because they purchased the product for different reasons and had different experiences while using it.

The court examines the predominance requirement through a review of the legal elements of the plaintiffs' causes of action, starting with NY GBL § 349. As in many consumer protection cases, the section 349 claim is the centerpiece of the lawsuit.

### New York General Business Law § 349

Section (a) declares as unlawful any deceptive act or practice in the conduct of business:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

Section (h) authorizes a private cause of action:

… [A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. Section (h) further authorizes treble damages up to $1,000 for willful or knowing violations as well as the award of attorney's fees to prevailing plaintiffs.

15

Decisional law has developed the elements of the § 349 private cause of action. The actions in question must be directed to consumers and occur in the course of business in New York State.

Plaintiffs must show that the acts were deceptive in a material way. *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20 (1995). The standard for proof that a deceptive statement is material is objective, requiring proof of a deceptive act that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26.

In contrast with claims of common law fraud, plaintiffs filing suit for deceptive business practices have no obligation to prove actual reliance on the statements at issue. *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000); *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 522 (2d Cir. 2005).

Causation is also an element of the § 349 private cause of action. A consumer must prove that he or she was "injured by reason of any violation of this section…". NY GBL § 349(h). The private remedy is limited to those who purchased the product or service and lost money or suffered some other adverse consequence as a result.

The decision of the New York Court of Appeals in *Oswego Laborers* illustrates the causation requirement. A bank supplied its customer with signature cards that omitted certain information about the payment of interest. Plaintiffs alleged that the omission was deceptive for purposes of § 349. The Court of Appeals remanded the case for a factual determination of whether the bank provided this information through other means and whether the plaintiffs "possessed or could reasonably have obtained the relevant information they now claim the Bank failed to provide." 85 N.Y.2d at 27. Despite the elimination of justifiable reliance as an element, the knowledge and individual circumstances of the consumer remained relevant to the issue of causation.

The Court of Appeals returned to the issue of causation in *Stutman*. In that case, a bank promised no prepayment fee but charged a $275 "attorneys fee" when the borrowers refinanced. The court ruled that the Appellate Division had erred in requiring evidence of reliance by the borrowers. "…[A]s we have repeatedly stated, reliance is not an element of a section 349 claim." The court then addressed the difficulty of distinguishing between reliance and causation. "Reliance and causation are twin concepts, but they are not identical." Causation requires proof that "defendant's material deception caused them to suffer a $275 loss. This allegation satisfies the causation requirement. Plaintiffs need not additionally allege that they would not otherwise have entered into the transaction. Nothing more is required." 95 N.Y.2d at 30.

The practical question is how the plaintiff proves causation. In the one-off case, the problem is more theoretical than real. A plaintiff can testify that she read the deceptive statement and it caused her to buy a product which fell short of expectations. Success depends upon her credibility. But the problem is more difficult in the class action setting in which a deceptive statement is alleged to have resulted in thousands of individual purchases. There is no way to ask each class member about the causal effect of the deceptive statement.

In many cases, a consumer's *reliance* on a statement and whether the statement *resulted in a loss* depend upon the same facts. These include seeing or reading the deceptive statement and responding by purchasing the product or service. Removing the element of reliance from a consumer protection remedy means little if the same requirement appears in the guise of causation.

The *Stutman* decision proposed to resolve this paradox by drawing on securities law decisions in which the materiality of a false statement or omission was held to satisfy the causation requirement as well. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S 128,

154 (1972) and *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970). By analogy, the act of making a material and deceptive statement to a consumer could satisfy the causation requirement in § 349 without further evidence of causation. But since the *Stutman* opinion resolved the case on different grounds – the absence of a deceptive statement in that particular case – the opinion fails to resolve the puzzle of how to excuse a plaintiff from proving that she relied on the false statement while continuing to require proof that the statement resulted in injury.

The court turns from the general contours of the § 349 claim to the question of whether proof of each element in this case will depend primarily upon common or individualized evidence.

The first element is that Fisher-Price made a deceptive statement. The alleged statement in this case is that the Sleeper was safe for infant sleep when it was not. Safety of the Sleeper is disputed on the merits, but it cannot reasonably be disputed that this case concerns public marketing statements by a single company. Whether these statements are deceptive for purposes of § 349 is subject to common proof across the class.

The second element is that the alleged misconduct affected consumers within New York. *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314 (2002). The New York class action is limited to purchases that occurred within New York or ownership of the Sleeper by a New York resident. The Sleeper was a consumer product purchased primarily for household use. Like the implied requirement of ascertainability, if the plaintiffs establish the other elements of their claim, the identification of class members through a claims procedure will satisfy this element. Because the class consists of New York consumers, common issues of fact predominate.

The third element is that the statement is material to the purchase of the Sleeper. Materiality is an objective standard expressed as whether a reasonable consumer would have

been misled by the defendant's conduct. In contrast to common law fraud, there is no requirement that individual plaintiffs prove that they reasonably relied on the deceptive statement in deciding to purchase the Sleeper. The materiality of any deceptive marketing statement is subject to common proof. At trial the fact finder would apply the objective standard of § 349 to the advertising and other statements about the Sleeper made by Fisher-Price.

The fourth element is causation defined by § 349 as injury "by reason of any violation." The New York Court of Appeals has long recognized the causation requirement. "...[A] plaintiff must prove 'actual' injury to recover under the statute, though not necessarily pecuniary harm. *Stutman*, 95 N.Y. 2d at 29 (emphasis in original.) In the CAC, plaintiffs allege that the deceptive statements caused actual injury to New York class members in three ways:

1. Had Plaintiffs and the members of the Class known of Defendants' deceptive acts and practices ... they would not have purchased and/or owned the product.

2. As a result of their unfair, unconscionable and/or deceptive acts and practices, Defendants were able to charge more for the Rock 'n Play Sleeper than what the product is worth.

3. As a direct and proximate result of Defendants' conduct in violation of GBL § 349, plaintiffs and the members of the Class have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member.

CAC ¶¶ 297-299.

The requirement of causation has two aspects that are logically distinct. The first is whether the plaintiff must prove that reading or hearing the deceptive statement caused him or her to purchase the product. The second is whether the resulting transaction led to economic loss or injury.

The most recent guidance from the New York Court of Appeals on the first issue –
causation in the sense of proof that the consumer saw and responded to the deceptive statement –
is the *Stutman* decision.  By drawing an explicit comparison between § 349 and "fraud on the
market" decisions such as *Affiliated Ute Citizens*, the *Stutman* decision suggests that proof of a
materially false statement standing alone may be sufficient to provide a basis for a finding of
causation.  Subsequent decisions have divided over whether § 349 requires evidence that the
consumer read or heard the deceptive statement.  *Compare Goldemberg v. Johnson & Johnson
Consumer Co.*, 8 F. Supp. 3d 467 (S.D.N.Y. 2014) ("To properly allege causation, a plaintiff
must state in his complaint that he has seen the misleading statements of which he complains
before he came into possession of the products he purchased.") and *Gale v. Int'l Bus. Machines
Corp.*, 781 N.Y.S. 2d 45, 47 (App. Div., 2d Dep't 2004) ("If the plaintiff did not see any of these
[misleading] statements, they could not have been the cause of his injury, there being no
connection between the deceptive act and the plaintiff's injury.") with O'*Neill v. Standard
Homeopathic Co.*, 346 F. Supp. 3d 511, 530 (S.D.N.Y. 2018) (factfinder may infer that plaintiff
saw the misleading statement.).

Viewed through the lens of predominance, the issue is whether common evidence can
generate a common answer, applicable to all class members.  The court is satisfied that plaintiffs
can present a prima facie case supporting a reasonable inference by the factfinder that the
marketing campaign, including the frequent reference to infant sleep, was a proximate cause of
the sale of more than 100,000 Sleepers in New York State.  The campaign was national in scope.
The Sleeper was an invention that promised to assist parents at a particular time in their child's
lives.  The Sleeper sales campaign informed the public that the product existed and was safe and
efficacious for infant sleep.  The role of these statements in driving sales of the product can be

proved through common evidence about the development and use of the marketing message. As *Stutman* suggests, a fact finder could infer that the promise of a sleeping baby was a substantial factor in motivating New York consumers to purchase the Sleeper.

It is the second aspect of causation that leads to greater difficulties for plaintiffs in establishing predominance. New York courts, primarily federal trial courts, have consistently required proof of causation in class actions asserting violations of § 349. It is not enough to prove that a consumer bought the product after learning about a deceptive statement. There must be some adverse consequence or in the words of § 349, an injury "by reason of any violation." Courts have considered whether the causation element can be satisfied through common evidence in at least four types of § 349 consumer cases.

First, some false statements satisfy the causation requirement without any need for individualized proof of causation because the statements are "*per se* illegal, and therefore deceptive … as a matter of law." *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125 (S.D.N.Y. 2014) (internal quotation omitted). Examples include the illegal membership charge for a dating service in *Rodriguez.* A second example is the deceptive sale of an auto insurance product in the guise of a warranty at issue in *Seekamp v. It's Huge, Inc.*, 2012 WL 860364 *10 (N.D.N.Y. Mar. 13, 2012) ("Though it is true … that each proposed class member may have opted to purchase [the anti-theft product] for different reasons, it is equally clear that every plaintiff would have relied on the implicit representation of the [product's] legality and beneficialness in deciding whether to purchase it." In cases like these, all consumers suffered similar injury through the purchase of an unlawful product. And in each case, the injury occurred at the moment of purchase without the need for further individualized proof of causation. Such cases may satisfy

21

the predominance requirement because the evidence about the illegal nature of the product applies to every purchase.

In contrast, the Sleeper was a legal product when sold. It may have been dangerous and the promises made in the marketing may have been deceptive, but the product was not *per se* illegal like the consumer contracts at issue in *Rodriguez* and *Seekamp*.

Second, some statements can be shown to cause the same damage to all consumers, satisfying the predominance inquiry, because the deceptive statement – while not *per se* unlawful – overstates the value of the product, resulting in the same price increase for every purchaser. These so-called "price premium" cases include *In re Scotts EZ Seed Litigation*, 304 F.R.D. at 409 ("…[C]lasswide evidence will determine whether plaintiffs were injured. Plaintiffs allege they suffered economic harm when they paid for a worthless product, or when they paid a premium for EZ Seed based on the false 50 % thicker claim." *See also Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57 (2d Cir. 2020) (price premium for "flushable" wipes subject to proof by common evidence); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561 (S.D.N.Y. 2014) (false statement that product was "100 % Pure Olive Oil" seen by every class member); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1008 (C.D. Cal. 2015) (applying New York law). In these cases, the "resulting injury" occurred when the class of consumers paid too much because a false claim about the product led to the same inflated price for every purchaser.

Plaintiffs assert that every purchaser of the Sleeper paid a premium because Fisher-Price did not disclose the truth about the product. But this is not a "price premium" case in which all consumers overpaid as a result of a false claim about the product. Unlike products marketed through value-enhancing statements that they are "natural" or "flushable" or otherwise superior to the competition, the market for child products is not stratified into products that are safe and

those that are unsafe but sold at a lower price.[4]  As the industry-wide CPSC recalls illustrate,

once the risks were evident, the national retail market for the Sleeper and similar devices closed.

(Other countries never permitted the sale of the Sleeper at all for the same reasons.)  The sale of

a product that is so dangerous that it is removed from the market once the danger is known

causes economic loss to consumers—but this loss is not distributed evenly across all purchasers

at the time of purchase as in the case of a "price premium."  Instead, the resulting loss to

consumers varies depending on the timing of the purchase, the period of use, and discard or

resale of the Sleeper after the baby outgrows it.

In a third group of cases, courts have found a lack of predominance because some

consumers were injured and others were not.  The simplest examples concern claims of purity or

other product attributes that were true in some cases and false in others.  *See In re Canon*

*Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) (no predominance in part because a small

minority of cameras malfunctioned); *Pagan v. Abbott Lab'ys, Inc.*, 287 F.R.D. 139 (E.D.N.Y.

2012) (individual inquiries required to determine whether class members purchased

contaminated baby formula).  In other cases, plaintiffs claim that the deceptive statement led

some consumers to choose the defendant's product over the less expensive competition.

Predominance was not present because some consumers overpaid and others did not.  *See*

*Ackerman v. Coca-Cola Co.*, 2013 WL 7044866 *20 (E.D.N.Y. July 18, 2013) ("Thus, while

there are common questions concerning the reasonable consumer's response to vitaminwater's

labeling and marketing, I find that individual questions regarding loss causation would

---

[4] There are products such as automobiles that may sell at a premium due to better safety features.
But the safety issue that resulted in the recall of recliner child's seats arose from a different type
of concern.  All reclining infant seats were recalled due to concerns about positional injury and
suffocation.  The retail market closed entirely as it has for products such as lawn darts and three-
wheeler ATVs.  This was not a market in which safety claims related to the design of the recliner
seat distinguished one brand over another.

overwhelm them."; *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004) ("To prove causation [for purposes of § 349, each plaintiff must show that Citibank's disclosure of the conversion fees was inadequate, thus deceiving the cardholder into using his Citibank card for foreign purchases when other more economical options were available." In both the adulteration cases and the cases involving false statements that led consumers to select one product over another, the courts have frequently ruled that predominance is not present because determining causation requires individualized evidence from consumers.

In a fourth group of cases, the courts have identified a need for individualized evidence of causation when some consumers were satisfied with the product despite the false labeling or some other deceptive practice. In *In re Avon Anti-Aging Skincare Creams and Products Marketing and Sales Practices Litigation*, 2015 WL 5730022 *7 (S.D.N.Y. Sept. 30, 2015) the court determined that predominance was not present in part because statements about the efficacy of face cream caused injury to some consumers while others remained satisfied with their purchase. "Courts in this district routinely reject claims that a materially misleading act or practice caused class-wide harm when many consumers who actually wanted the product notwithstanding the misleading act were not injured." *See also Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013) (no predominance when a portion of the class desired the product despite the deceptive business practice).

The § 349 claim in this case resembles cases in the final category. The alleged deceptive statement that the Sleeper was safe for infant sleep is not itself a violation of law. It does not promote a particular feature of the product that generated a higher price than its competitors. Nor was it a statement about purity or some other attribute that varied from one unit to the next. Rather, as plaintiffs allege at ¶¶ 297-298 of the CAC, the deceptive statements caused plaintiffs

24

to select the product and to pay more than its value which plaintiffs describe as either zero or the amount an average consumer would pay for a dangerous product for their baby.

The results of the deceptive statements varied greatly from one family to the next. Some families were entirely fortunate. They purchased the product long before the recall and discarded it after their baby outgrew it. Or they resold it. Or it is gathering dust in their basement, but they have no intention of returning it to service. The deceptive statement had no harmful effect on these purchasers. They lost no value because they used the product in the manner they intended and were satisfied with the results.

Other families may have been less fortunate. They may have purchased the product in 2019 and stopped using it after reading the *Consumer Reports* article. They may not be able to sell it because they fear injury to someone else's child. These consumers suffered financial loss caused by the deceptive statements.

Finally, given the suspicion with which some of our citizens view health and safety warnings from official sources, some families may continue to use the Sleeper despite the efforts of the CPSC and Fisher-Price to remove it from the market. They may also resell the product to similarly-minded families. These consumers may have suffered no loss or a partial loss in value if safety concerns reduced the price they received at resale.

All of these consequences – and more that the court has not thought of – affect the individual issues of causation for each consumer. While it is easy enough to formulate a common question such as "Did the deceptive statement that the Sleeper was safe for infant sleep cause loss or injury to you and your family," this question is unlikely to yield common answers. The many possible answers to the causation inquiry demonstrate that the proposed class is not cohesive. *See Amchem Products, Inc.*, 521 U.S. at 623 ("The Rule 23(b)((3) predominance

25

inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") Instead, the many potential answers demonstrate that the proposed class of 100,000 New York consumers includes people who suffered no resulting injury from their purchase and others who lost money because disclosure to the public of the risks of the Sleeper caused economic loss. For this reason, the court concludes that common questions of fact do not predominate when the court considers the important element of causation in the § 349 claims. The court will not certify a Fed. R. Civ. P. 23(b)(3) class on the § 349 claim. Instead, the court will focus attention on an issues class certified pursuant to Fed. R. Civ. P. 23(c)(4).

Calculation of damages is the final element of the § 349 cause of action. The damages question is closely related to causation and shares common features. Causation requires us to determine what harm resulted from the defendant's conduct. Damages, of course, is the other side of the same coin – the amount of that harm. In the court's view, causation requires a determination of the consequences of buying the Sleeper for each consumer. If this question is answered on an individual basis, then reducing these consequences to an amount of money is a closely related issue.

The difficulty the causation issue presents to collective litigation provides something of a silver lining in the damage determination. Because the requirement of individualized proof of causation stands in the way of a comprehensive judgment on both liability and damages, there is no need to limit the resolution of the damages issue to a collective model such as that proposed by plaintiff's expert Colin Weir. People paid different amounts for their Sleepers and for that reason alone sustained damages in different amounts. They also kept the Sleepers for different periods of time and sold or discarded them in various ways. Faced with the necessity of

deferring the causation issue to an individualized determination, the court can leave open individual measures of damages also.

The range of potential answers to the damages question in any single case is quite limited. It may be zero and it may be the full price of the Sleeper – as much as $150 in a few cases but more commonly around $70. These limits lend themselves to various ways of compensating consumers if plaintiffs succeed in an "issues" trial on liability. These could include short bellweather trials in groups of six or eight until both sides conclude that they understand how New York juries view these cases. Or the parties could reach agreement on a claims procedure as part of a larger settlement. These questions are better resolved after a class trial on common liability issues.

In addition to the elements of the cause of action, the court has considered whether common issues of fact predominate with respect to the affirmative defense of statute of limitations asserted by Fisher-Price. Actions brought pursuant to § 349 are subject to the three-year time limit imposed for actions based on statutory violations by operation of NY CPLR § 214(2). *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201 (2001). Accrual occurs when the plaintiffs' "respective injuries occurred as a result of the alleged statutory violations." *Id.* at 210. In this case, accrual would occur at the time of sale of the product through deceptive statements in the marketing materials. The accrual date is subject to equitable tolling in cases of fraudulent concealment by the defendants. *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405 (E.D.N.Y. 2004).

Equitable tolling requires proof that the defendant concealed the existence of the cause of action from plaintiff; that the plaintiff remained in ignorance prior to the filing of the complaint; and that ignorance was not attributable to a lack of diligence on the plaintiff's part. *State of New*

*York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988), *cert. denied*, 488 U.S. 848 (1988). While defendants' conduct in allegedly concealing the existence of the cause of action is subject to common proof, the knowledge of individual plaintiffs and their diligence in inquiring into the claim are matters of individual proof. Like the issue of causation, individual issues predominate with respect to proof of equitable tolling for class members who viewed the deceptive marketing and purchased the Sleeper more than three years before the filing of the lawsuit.

The predominance analysis for the remaining claims of implied warranty and unjust enrichment is simpler.

### **Breach of Implied Warranties**

The elements of claims for breach of the implied warranty of merchantability resulting in economic loss are:

    a.   Seller is a merchant who engages in the sales of goods of the kind purchased;

    b.   The goods were not fit for the ordinary purposes for which such goods are used;

    c.   Seller knew or reasonably should have known of the defects and failed to disclose them to the buyer.

NY U.C.C. § 2-314. The court's inquiry "focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Denny v. Ford Motor Co.*, 87 N.Y. 2d 248, 258 n.4 (1995).

The elements of the implied warranty of fitness for a particular purpose are:

    a.   The seller knew of the particular purpose for which the goods were required; and

    b.   Knew further that the buyer relied on the seller's skill or judgment to select or furnish suitable goods.

NY U.C.C. § 2-315.

Both implied warranties are subject to a privity requirement in cases such as this involving claims of economic loss. *Ebin v. Kangadis Food Inc.*, 2013 WL 6504547 *6 (S.D.N.Y. Dec. 11, 2013). Privity requires evidence of a sale directly from the defendant to the consumer. A sale by an independent retailer would lack this element of vertical privity. In the context of this case, the implied warranty claims include proof of a direct purchase from Fisher-Price or "vertical privity." The court understands that some Sleeper units were sold directly to consumers by Fisher-Price. Others were purchased through retail stores and many were also purchased through online retailers. The privity question alone cannot be answered without individualized inquiry into how each consumer bought his or her Sleeper.

There are two principal exceptions to the privity requirement in New York law. N.Y. U.C.C. § 2-318 eliminates the privity requirement for personal injury claims. That exception is irrelevant here. There is also a limited exception for third-party beneficiary claims. That exception requires proof that the parties' intent to benefit that the nonparty (in this case, a purchaser or other consumer) be "an intended and not a mere incidental beneficiary…[and] the parties' intent to benefit the third party must be apparent from the fact of the contract." *Bristol Vill., Inc. v. Louisiana-Pacific Corp.*, 916 F. Supp. 2d 357, 363 (W.D.N.Y. 2013). Plaintiffs offer no evidence or plausible basis for a determination that Fisher-Price and the retail stores included evidence of an intent to extend the implied warranties to individual consumers. If merits discovery develops different evidence, plaintiffs may return to this issue. The current record contains no factual basis for such an assertion.

Finally, plaintiffs point to the decision of a district court judge in *Hubbard v. General Motors Corp.*, 1996 WL 274018 (S.D.N.Y. May 22, 1996) recognizing an exception to the privity requirement for "things of danger." *Hubbard* concerned allegations of a defective

29

braking system.  Drawing on language from a wrongful death case, *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432 (1963), the *Hubbard* decision did not enforce the privity requirement in the case of a product that was likely to be a source of danger in the hands of the consumer.  *Id.* at *5.  The *Hubbard* ruling has not been widely accepted by other trial judges. *Feliciano v. General Motors LLC*, 2016 WL 9344120 *7 (S.D.N.Y. Mar. 31, 2016) ("Whether the *Hubbard* exception accurately reflects New York law is disputed.").  Nor has it been adopted by the New York State appellate courts.  *Adirondack Combustion Techs., Inc. v. Unicontrol, Inc.*, 793 N.Y.S. 2d 576, 579 (2005) ("A claim based upon a breach of an implied warranty requires a showing of privity between the manufacturer and the plaintiff when there is no claim for personal injuries."   In permitting recovery on implied warranty theories for economic loss, the *Hubbard* ruling eliminates the privity requirement in all cases involving hazards or risk of injury. There is scant support for a conclusion that some twenty-five years later, this decision represents New York law.

### Unjust Enrichment

Unjust enrichment requires proof that the defendant was enriched at the plaintiff's expense and that the circumstances were such that equity and good conscience require that defendant make restitution.  *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439 (E.D.N.Y. 2013); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y. 3d 173, 182 (2011) (cleaned up); *Corsello v. Verizon N.Y., Inc.* 18 N.Y. 3d 777 (2012).  These are elements that require individualized examination of the transaction and the consequences for both parties.  The unjust enrichment claim of parents who bought the Sleeper will vary widely depending on when they bought the Sleeper, how long they used it, and the circumstances under which they got rid of it after their

child outgrew it.  These are claims not subject to common evidence.  *Vaccariello*, 295 F.R.D. at 75-76.

<u>**Superiority**</u>

For the sake of completeness, the court also considers whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The rule identifies four factors by which courts can measure the advantages of combining multiple claims into a single class action.  These are:

- class members' interests in individual control of separate actions;
- any pending litigation concerning the same controversy;
- desirability of concentrating the litigation in a single forum;
- likely difficulties in managing the class action.

This is a case in which it is unlikely that a plaintiff will pursue an individual claim.  The product was relatively inexpensive.  It was useful for a relatively short time, at least in the case of any single baby.  It is a case in which "many individuals have small damage claims…and absent a class suit, it is unlikely that any of the claimants will be accorded relief."  *Newberg on Class Actions* § 4.64  (2021).

The specific factors governing superiority favor class certification.  Class members have little interest in individual control of separate actions to recover the cost of a product that sold for between $50 and $150.  All pending litigation in the federal courts has been located in this multi-district proceeding.  The only other pending litigation concerns injury and damage claims that are entirely separate from the consumer claims pled in this case.  There are no advantages to distributing these claims widely across the courts of New York State or more broadly.  Concentrating the litigation in a single court is more efficient.  In the event of a class trial or

settlement, the case presents the problems that attend any resolution of a case with 100,000 or more potential claims in New York State alone. If plaintiffs prevailed in a liability trial, the Sleeper was sufficiently expensive that many consumers may still be able to locate proof of purchase or the product itself in a claims process similar to other consumer class actions.

The court finds that the superiority element is present.

## III.    Equitable Relief – Fed. R. Civ. P. 23(b)(2)

The court turns to plaintiffs' claim for equitable relief in the form of an injunction that would remedy shortcomings in the recall previously administered by the CPSC. Plaintiffs seek dissemination of a revised recall notice; modification of the terms of the recall to make participation less burdensome and permit participation by all consumers regardless of who purchased the Sleeper; and implementation of a nationwide corrective advertising campaign to better inform parents about safe sleep guidelines. Plaintiffs' Memo. in Support of Motion for Class Certification at 46 (Doc. 125).

Defendants respond that certification of a class for equitable relief is inappropriate for two reasons. First, the class representatives lack standing because they have already learned about the danger of the Sleeper and have stopped using it. Some chose to participate in the recall; others did not. Second, plaintiffs' claim for a full refund is at the heart of both the damages and the equitable claims. The monetary relief is hardly incidental to their equitable claim.

The court denies certification of an equitable class on standing grounds. Any class representative is by definition both a past purchaser of the Sleeper *and* a person who has become familiar with the risk to a baby who falls asleep in the product. He or she is no longer deceived by the marketing. In *Berni v. Barilla S.P.A.,* 964 F.3d 141 (2d Cir. 2020), the Second Circuit

turned away a similar claim for equitable relief seeking improved information on boxes of pasta. "In the first place, past purchasers are not bound to purchase a product again – meaning that once they become aware they have been deceived, that will often be the last time they will buy that item." *Id.* at 147. Even if they do buy the product again, "they will not again be under the illusion [promoted by the defendant's deceptive conduct.]" *Id.* at 148.

Numerous trial court decisions within the Second Circuit have reached results consistent with the *Berni* decision. These include *Davis v. Hain Celestial Group, Inc.*, 297 F. Supp. 3d 327 (E.D.N.Y. 2018) (no danger that a plaintiff in a false advertising case will be deceived again); *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017); *Elkind v. Revlon Consumer Prods. Corp.*, 2015 WL 2344134 (E.D.N.Y. May 14, 2015); *In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, 2015 WL 5730022 at *7; *Vaccariello,* 295 F.R.D. at 62.

The court also denies certification on the second ground: the overlap between the damages claim and the equitable claim. The court begins with the general principles laid out in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The certification of an equitable claim under Fed. R. Civ. P. 23(b)(2) presents fewer hurdles to the plaintiff. "The procedural protections attending the (b)(3) [damages] class – predominance, superiority, mandatory notice, and the right to opt out – are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*." *Id.* at 362 (emphasis in original). Individuals with money damage claims have due process rights that justify these added requirements in the (b)(3) setting. These protections are not afforded in the (b)(2) setting because the rights of class members to pursue their own lawsuits are not curtailed. The practical consequence of this distinction is that certification under (b)(2) is most common in settings such

as racial discrimination in which the rights of the entire class can be protected through an injunction. Rubinstein, *Newberg on Class Actions* § 4.26 (2001). When payment of money becomes the focus of the lawsuit, certification under (b)(2) is permissible only when the damage award is incidental to the injunctive relief. *Dukes*, 564 U.S. at 360.

In the context of many cases, including this one, the curtailment of individual claims by an injunction is more imagined than real. Few purchasers of Sleepers who missed out on the recall are likely to file individual lawsuits for the purchase price of the product. An injunction requiring an enhanced recall could be drafted to preserve individual consumer protection claims under § 349. But the principle that payment of damage claims like refunds is not appropriate for the less-demanding standards of (b)(2) remains an important consideration in the certification analysis. *See Dukes*, 564 U.S. at 360 ("…[C]laims for individualized relief (like the backpay at issue here) do not satisfy the Rule."). Ordering the defendants to return the purchase price through a second recall is effectively no different than ordering them to pay damages in the amount of the same purchase price.

There is an exception to the rule expressed in *Dukes* for injunctions where the monetary relief is incidental to the injunctive or declaratory relief. In this case, plaintiffs request an improved warning, published on a national basis, for the Sleeper. That is relief which is common to all class members and separate from the claim for a refund. But to be candid, it is window-dressing. The Sleeper and products like it have been off the market since 2019. At that time, the CPSC ordered a national warning campaign. The Sleeper was also the subject of an expose in *Consumer Reports*, a widely-read magazine. Other manufacturers discontinued sales of similar products. The removal of the Sleeper has already been widely publicized. The refund is at the core of plaintiffs' claim, and the proposed publicity campaign about a product no longer

on the market cannot be said to be divisible or independent of the effort to recover the purchase price for each consumer.

Because the availability of a refund is central to the injunction sought by plaintiffs, it is not appropriate for certification under (b)(2).

## IV.  Issue Class Certification Under 23(c)(4)

Plaintiffs also seek limited certification on two issues: whether defendants' marketing statements would have led a reasonable consumer to believe that the Sleeper was safe for infant sleep and whether these statements were material to the decision to purchase the Sleeper. "Rule 23(c)(4)(A) permits a class to be certified for specific issues or elements of claims raised in the litigation." Manual for Complex Litigation, § 21.24. Its use creates a bifurcated trial in which some issues are resolved on a class basis through summary judgment or trial and other individualized issues such as damages remain for individual trial. The rule permits an issues class even when the lack of predominance prevents certification of the entire case. *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) (court may employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement).

Certification of an issues class is most useful when it resolves liability issues, leaving individual damages for individual adjudication. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. at 338 ("Here litigating [one aspect of the] liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy.") The example supplied by the Advisory Committee Notes to the 1966 amendments is just such an instance. "For example, in a fraud or similar case the action may retain its "class" character only through

35

the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims."

In this case, the facts that lie at the heart of the § 349 claim are all subject to proof by common evidence. These include the claim that lies at the heart of this case: that Fisher-Price made false statements in its marketing campaign that the Sleeper was safe for infant sleep. The related issue of materiality is similarly subject to common proof. The parties disagree strongly over the question of whether Fisher-Price made deceptive statements. Answering that question through the trial process will go a long way towards moving this litigation to a conclusion. Although a verdict would not necessarily bind the parties in cases pending in other states, at a minimum, it would be highly instructive.

The court will certify an issues class under Fed. R. Civ. P. 23(c)(4). The court anticipates holding a jury trial in Buffalo as soon as the parties can be ready. The court recognizes that despite ample briefing and a very helpful all-day hearing, the parties have not focused with the court on the most useful parameters of an issues trial as well as the discovery and other procedures necessary to prepare. The court requests that within 30 days, the plaintiffs supply a memorandum outlining their views on the steps remaining and the best scope of an issues trial. Issues may include any refinement of class definition, issues related to notice and opt-out, remaining discovery, likely dispositive motions, and disposition of implied warranty and unjust enrichment claims. The defense shall have 30 days to file a response. Any reply shall be filed within 15 days. Following receipt of this briefing, the court will issue a certification order that adopts by reference this more extended discussion.

## **CONCLUSION**

Subject to additional briefing, the court will certify an issues class pursuant to Fed. R. Civ. P. 23(c)(4).

Dated this 2nd day of June, 2022.

Geoffrey W. Crawford
U.S. District Court Judge